**CHRISSY F., by Her Next Friend and Guardian Ad Litem, Donna MEDLEY, Plaintiff,**

v.

**MISSISSIPPI DEPARTMENT OF PUBLIC WELFARE, Thomas H. Brittian, Jr., Individually and as Commissioner of the Mississippi Department of Public Welfare, Sebe Dale, Jr., Individually and as Chancellor for the Tenth Chancery Court District of Mississippi, Gar-**

land Upton, Individually and as Referee of the Marion County Youth Court, Richard L. Douglas, Individually and as District Attorney for Marion County, Mississippi, Marion County Welfare Department, Hancock County Welfare Department, Jeanette Werbey, as Supervisor of Hancock County Welfare Department, Angela Lacy, Individually and as Caseworker for Marion County Welfare Department, Phillip Broadhead, Fred Cooper, Timothy Charles Foxworth, Sharon Whitt, Individually and as Supervisor of Marion County Welfare Department, and Lamar Braxton, Carol Burger, Carole Haney, R.D. Harris, William Reed, Katherin Shepard, and Jessie Weeks, in their official capacities as members of the State Board of Public Welfare, Defendants.

No. J88–0340(B).

United States District Court,
S.D. Mississippi,
Jackson Division.

Dec. 6, 1991.

Daniel S. Mason, Christopher T. Michelletti, Furth Fahrner & Mason, San Francisco, Cal., for plaintiffs.

Sheila Brogna, Children's Law Offices, San Francisco, Cal., for plaintiff.

James F. Steele, Robert G. Jenkins, Office of Atty. Gen., Jackson, Miss., for State defendants.

Thomas D. McNeese, Aultman Tyner McNeese Ruffin, Ltd., Columbia, Miss., for R. Douglass.

Larry O. Norris, P.A., Hattiesburg, Miss., for Timothy C. Foxworth.

## TABLE OF CONTENTS

I. FACTS AND PROCEDURAL HISTORY ................................. 1108
II. CONCLUSIONS OF LAW .......................................... 1115
 A. Elements of a Section 1983 Action .................................. 1115
 B. Substantive Due Process Claims ...................................... 1117
 (1) liberty interests and constitutionally protected rights to personal
 safety ...................................................... 1118
 (2) right of access to courts ...................................... 1119
 a. jurisdictional issues as between chancery court and youth court... 1120
 b. inaction and affirmative activity ............................. 1124
 C. Procedural Due Process Claims ..................................... 1127
 D. CAPTA Claims ...................................................... 1129
 E. Pendent State Law Claims ......................................... 1130
III. REMEDIES .................................................... 1130
IV. CONCLUSION ................................................. 1131

---

MEMORANDUM OPINION
AND ORDER

BARBOUR, Chief Judge.

This matter is on remand pursuant to the Order of the United States Court of Appeals for the Fifth Circuit in the case of *Chrissy F. v. Mississippi Department of Welfare, et al.*, 883 F.2d 25 (5th Cir.1989). Pursuant to that Order, this Court conducted an evidentiary hearing beginning June 10, 1991, on the merits of the Complaint filed in this matter. The Court, having considered the evidence and arguments presented by the parties, renders the following findings of fact and conclusions of law.

## I. FACTS AND PROCEDURAL HISTORY

On May 15, 1981, Dorrie Singley married Defendant Timothy Foxworth in Columbia, Mississippi, a small town located in Marion County, Mississippi. On May 15, 1982, Singley gave birth to Foxworth's daughter, Crystal Marie Foxworth ("Chrissy").

Singley and Foxworth were divorced on November 29, 1984, pursuant to a divorce decree of the Chancery Court of Marion County, Mississippi. The divorce decree granted Singley physical custody of Chrissy and gave Foxworth visitation rights with the child.

Between the date of the divorce decree and March, 1985, cooperation between Singley and Foxworth regarding visitation with Chrissy degenerated substantially. On March 8, 1985, Foxworth filed a motion for citation of contempt in Marion County Chancery Court, asserting that Singley had willfully refused to allow Foxworth to exercise his visitation rights as provided in the divorce decree. Foxworth subsequently amended the motion to include allegations that Singley had moved the child outside of the State of Mississippi, thereby further impeding Foxworth's attempts to visit Chrissy. Foxworth believed that Singley had either remarried or was living with a boyfriend in Texas.

On August 7, 1985, Foxworth's motion for citation of contempt was heard before Defendant Chancellor Sebe Dale, Jr., to whom the Foxworth divorce and custody matter had been assigned. Judge Dale had not heard the original divorce proceeding between Singley and Foxworth. During the hearing, allegations were made for the first time that Singley would not allow Chrissy to visit with Foxworth because of Singley's belief that Foxworth was sexually abusing the child. On August 22, 1985, Judge Dale entered an order on the motion, finding that Singley was in contempt of the visitation provisions of the court's divorce decree and ordering Singley's incarceration upon her return to the court's jurisdiction.

In May, 1986, Singley returned to Mississippi and took up residence in Bay St. Louis, which is located in Hancock County, Mississippi. She was subsequently arrested for contempt and jailed from July 8

through July 18, 1986, pursuant to Judge Dale's order. Because of Singley's incarceration and the allegations of child sexual abuse that had been raised in the matter, the case received substantial media attention and was on its way toward becoming a cause celebre for those interested in the rights of abused children.

Following her release from jail, Singley sought the assistance of Defendant Richard Douglas, District Attorney for the 15th Judicial District of Mississippi, which includes Marion County and Columbia, Mississippi. Douglas informed Singley that he needed physical evidence of the alleged sexual abuse before he could institute criminal proceedings against Foxworth.

On November 18, 1986, following a visitation period with Foxworth, Chrissy was taken to a hospital emergency room in Hancock County, Mississippi, the county where Singley and her daughter were then residing. Dr. William Bradford examined the child and thereupon filed a "Report of Suspected Battered Child" regarding Chrissy with the Hancock County Welfare Department. In his report, Dr. Bradford noted physical symptoms that suggested Chrissy may have been sexually abused. Dr. Bradford recommended to Singley that she seek follow-up assistance from the Mississippi Department of Public Welfare.

On November 19, 1986, Singley met with Bridget Logan of the Hancock County Welfare Department to discuss the suspected sexual abuse noted in Dr. Bradford's report. Logan interviewed Singley and Chrissy individually and recommended that Chrissy be examined by a pediatrician experienced in child sexual abuse cases.

On November 25, 1986, Logan accompanied Singley to the office of Dr. R. Bryant McCrary, the pediatrician whom Logan had recommended to Singley. Following his examination of Chrissy, Dr. McCrary filed a "Report of Suspected Battered Child" with the Hancock County Welfare Department in which he stated that his findings were "very suspicious of child abuse." While still at Dr. McCrary's office, Logan telephoned Judge Dale's office to inform him of the findings made by Drs. Bradford and McCrary. However, no action was taken at that time to suspend or otherwise modify Chrissy's visitation with Foxworth.

On November 26, 1986, Chrissy was interviewed by Margaret Alfonso, Assistant District Attorney for Hancock County, Mississippi, who had been notified of Chrissy's case by Dr. McCrary. On December 1, 1986, Alfonso wrote to Marion County District Attorney Douglas, noting that she had interviewed Chrissy, that Chrissy had told her of specific acts of molestation that had occurred during her visits to Columbia, Mississippi, with Foxworth, and that criminal prosecution of Foxworth should be considered based on the strength of the evidence.

On December 3, 1986, Garnett Harrison, the attorney Singley had retained at the recommendation of Alfonso, sent the medical reports of Drs. Bradford and McCrary to Mason Sistrunk, an investigator in the Marion County District Attorney's Office. Harrison also wrote to Logan and requested that she file an abuse petition in Hancock County, the county in which Singley and Chrissy resided. However, Logan advised Harrison that the matter needed to be handled in Marion County Chancery Court and that any Youth Court action that might be appropriate would also need to be initiated in Marion County. Logan further informed Harrison that this information had been relayed to Sistrunk in the Marion County District Attorney's Office.

On December 10, 1986, Singley met with Gary Arthur, a case worker with the Marion County Welfare Department. At that meeting, Singley provided Arthur with copies of the reports of Drs. Bradford and McCrary and a copy of Alfonso's December 1, 1986, letter to Douglas. Arthur interviewed Chrissy about the alleged sexual abuse, but she was unable to verbalize the alleged incidents other than to say, "Daddy did it."

On December 11, 1986, Arthur prepared a "Report of Suspected Battered Child" form and sent it to District Attorney Douglas and the Marion County Sheriff's Department to inform them that the Marion County Welfare Department was investi-

gating the Foxworth matter. On December 12, 1986, Arthur prepared an investigation report which indicated that Arthur had been told by Marion County Attorney Forrest Dantin that the matter would be handled by Judge Dale in Chancery Court as a custody matter rather than in Youth Court. The report also indicated that Arthur was told by Judge Dale that this matter would be handled in Chancery Court. Accordingly, Arthur closed the Marion County Welfare Department case file on Chrissy.

On December 17, 1986, Foxworth filed a motion in Chancery Court to modify the custody provisions regarding Chrissy so that paramount custody of Chrissy would be vested with Foxworth. In furtherance of his motion, Foxworth arranged to have Chrissy interviewed by a psychologist, Dr. Franklin Jones.

On June 15, 1987, Singley filed a counterclaim for modification of the divorce decree, alleging that Foxworth had sexually abused Chrissy and seeking a modification of the divorce decree to include supervised visitation by Foxworth, counseling, and payment of medical expenses. Singley also moved the Chancery Court for the appointment of a guardian ad litem for Chrissy.

On June 22, 1987, Judge Dale held a hearing to review the requests for modifications to the custody orders regarding Chrissy. On August 4, 1987, Judge Dale issued an opinion and order finding that Singley was not a credible witness, that allegations of Foxworth's abusing Chrissy were not proven, that Singley was not providing Chrissy with a proper home, and that the prior custody order should be modified so that paramount custody of Chrissy be vested with Foxworth. Following entry of the order, Singley did not surrender Chrissy to Foxworth's care.

On August 10, 1987, Singley took Chrissy to Children's Hospital in New Orleans, Louisiana, where Chrissy was examined by Dr. Rebecca Russell, a licensed physician who was specifically trained in the area of child sexual abuse. Based on her examina-

tion of Chrissy, Dr. Russell concluded that several of the physical findings could only be caused by sexual molestation. Based on Dr. Russell's findings, Singley immediately moved the Chancery Court for a new trial or, in the alternative, for supersedeas bond. That motion was summarily denied by Judge Dale.

On August 17, 1987, Foxworth filed a petition for contempt, alleging that Singley had failed to turn Chrissy over to Foxworth as required by the August 4 custody modification.

On August 18, 1987, attorney Harrison noticed the deposition of Dr. Russell. Foxworth moved for and was granted a protective order prohibiting the taking of Dr. Russell's deposition. However, the deposition of Dr. Russell was subsequently taken by Harrison on August 23, 1987. Singley thereafter filed with the Chancery Court a motion to reopen the custody hearing in Chancery Court, a second motion for appointment of a guardian ad litem, and a motion to recuse directed at Judge Dale. Singley also filed an emergency appeal and supersedeas bond with the Mississippi Supreme Court, seeking to have the custody modifications overturned.

On August 28, 1987, a hearing was held on Foxworth's petition for contempt. At the hearing, Judge Dale received, but refused to admit as evidence or otherwise consider, a copy of Dr. Russell's report.[1] Judge Dale found Singley to be in contempt of court for failure to turn over physical custody of Chrissy to Foxworth. Singley did not appear at the hearing and had in fact gone into hiding with Chrissy in defiance of the orders of the Chancery Court.

On September 23, 1987, Singley's petition for emergency hearing and extraordinary relief was denied by the Mississippi Supreme Court. Singley's attorney thereupon filed a certificate of appeal to the Mississippi Supreme Court.

---

**1.** A copy of the Russell report had also been furnished to District Attorney Douglas at this time in support of the criminal investigation

Singley and her attorney continued to urge against Foxworth.

On October 7, 1987, Judge Dale entered an order nunc pro tunc denying Singley's motions to reopen the case, to appoint a guardian ad litem, and to recuse.

On October 14, 1987, Singley was admitted to Charity Hospital in New Orleans, Louisiana under an assumed name. She died later that day from a brain aneurism. Chrissy's location was still unknown at that time to Foxworth.

In late October, 1987, attorney Harrison sent a copy of the Russell report to Bridget Logan, the Hancock County Welfare Department worker who had first handled the sexual abuse charges concerning Chrissy. Harrison asked Logan to file a petition on Chrissy's behalf in Hancock County. Logan discussed the matter with her supervisor, Defendant Jeanette Werbey. However, no petition was filed and no further investigation of the matter was conducted.

On December 5, 1987, Donna Medley, director of the San Francisco Victim Witness Assistance Program and Chrissy's next friend in this proceeding, received a phone call from Gail Martin, a paralegal who worked for Harrison in her Gulfport, Mississippi, office. Martin informed Medley that she was at the San Francisco airport with Chrissy and needed to bring Chrissy before juvenile authorities in California. Medley contacted an attorney with Legal Services for Children and requested that Chrissy be brought before Child Protective Services, San Francisco Department of Social Services, and other juvenile authorities as soon as possible.

On December 10, 1987, Medley and her attorney met with Judge Daniel Weinstein of the San Francisco Juvenile Court to discuss Chrissy's case. The following day, the San Francisco Department of Social Services filed a petition on Chrissy's behalf in San Francisco Juvenile Court, alleging that Chrissy would be at risk for abuse if returned to the custody of Foxworth. Judge Weinstein thereupon signed a detention order, finding that an urgent and immediate need existed to ensure Chrissy's protection, and Chrissy was placed under the temporary custody of the Department of Social Services in Medley's home. Foxworth was then notified by the San Francisco Department of Social Services that Chrissy had been taken into protective custody in San Francisco. This was the first time Foxworth was aware of the location of his daughter since her disappearance in mid-August.

At a hearing on December 14, 1987, Judge Weinstein ordered a physical and psychological examination of Chrissy by Dr. Graeme Hanson. The court also agreed to assert temporary jurisdiction over the matter until such time as factual and legal findings pertinent to the jurisdictional issue could be made.

On December 15, 1987, Judge Dale entered an order in a matter styled "In the Interest of Crystal Marie Foxworth, Minor," which directed District Attorney Douglas to travel to San Francisco, obtain custody of Chrissy, and return her to Mississippi. No cause number appeared on the order, which was purportedly entered in the Chancery Court of Marion County, Mississippi, Youth Court Division. On that same date, Marilyn Willard, a child welfare supervisor with the Department of Social Services in San Francisco, spoke with Defendant Sharon Whitt, supervisor for the Marion County Welfare Department, to inquire about possible placement of Chrissy if she were to be returned to Mississippi. Whitt informed Willard that Defendant Thomas Brittian, the Commissioner of the Mississippi Department of Public Welfare, was personally supervising the Department's efforts to assist in the Foxworth matter.

On December 16, 1987, Judge Weinstein spoke directly with both Judge Dale and Brittian concerning Chrissy's status and the circumstances under which Chrissy might be returned to Mississippi. Both Judge Dale and Brittian assured Judge Weinstein that Chrissy would undergo physical and psychological evaluation if she were returned to Mississippi, that she would be placed in a neutral environment upon her return, that a youth court petition would be filed on her behalf, and that a guardian ad litem would be appointed to ensure that her interests were legally pro-

tected. Judge Dale specifically informed Judge Weinstein that a petition had been filed in Marion County Youth Court that day on Chrissy's behalf. Judge Weinstein also spoke with Dr. Hanson, who had completed his preliminary evaluation of Chrissy. Dr. Hanson reported that, although he could not make a conclusive finding as to molestation, there was enough evidence to warrant an extensive evaluation of Chrissy in order to determine if any sexual abuse had occurred. Dr. Hanson suggested that the evaluation should be made in a neutral setting where Chrissy would not be under any strong pressures from any particular party.

Following his communications with Judge Dale, Brittian, and Dr. Hanson, Judge Weinstein presided over a contested hearing to determine if Chrissy should be detained in California or returned to the jurisdiction of the Mississippi court. District Attorney Douglas appeared at that hearing and agreed that, in addition to the representations made by Judge Dale and Brittian, he would support the appointment of a competent guardian ad litem for Chrissy. In addition to Douglas, attorneys for Foxworth were present at the hearing and were apprised of all considerations relevant to Chrissy's possible return to Mississippi.

On December 16, 1987, Judge Weinstein entered an order declining to exercise jurisdiction over Chrissy. Judge Weinstein noted that his decision was partially based on representations made to him by Mississippi officials that Chrissy's legal interests would be protected if she returned to Mississippi. Accordingly, Judge Weinstein declined jurisdiction and placed the temporary custody of Chrissy with Douglas on the following conditions:

a. that the minor be placed, upon her arrival in Mississippi, in a neutral, stable setting and not with any maternal or paternal relatives;

b. that the minor be physically and psychologically or psychiatrically evaluated and that all treatment recommendations be followed through with;

c. that the minor be appointed a guardian ad litem who will be a qualified attorney at law to represent the best interests of the child;

d. that the Mississippi Department of Welfare has initiated and filed a petition on behalf of the minor in order to insure her protection and detention in a neutral setting; and

e. no contact with father until further order of the Mississippi Court.

On the day that the California court issued the order allowing Chrissy's return to Mississippi, Defendant Angela Lacy, a social worker with the Marion County Welfare Department, received a call from Family and Children Services in Lawrence County, Mississippi, informing her that a long-term foster home for Chrissy had been arranged in Monticello, Mississippi. This information was relayed to Judge Dale's office and to Willard in the San Francisco Department of Social Services.

On December 17, 1987, Chrissy returned to Mississippi with Douglas. Concurrently with Chrissy's return, several matters were taken up in both Marion County Chancery Court and Marion County Youth Court relating to the custody issue. Judge Dale issued a temporary order in the divorce proceedings stating that the Chancery Court deemed it to be in the best interests of the child to have her physical, mental, and emotional status evaluated "by competent professionals and under the direction of the Court" prior to physical custody of the child being turned over to Foxworth. Judge Dale further ordered that it would be most expedient "to utilize the machinery of the Youth Court Division of this Court [2]

---

**2.** In Mississippi counties such as Marion County which have no family court or county court, the youth court is administered as a division of the chancery court, and chancery judges serve as youth court judges for those jurisdictions. Miss. Code Ann. § 43–21–107(3) (1972). If chancery judges do not wish to personally adjudicate juvenile matters filed within the youth court division of the court, they may appoint referees to act in such cases. Miss.Code Ann. § 42–21–111(1) (1972). Hearings before a youth court referee proceed in the same manner as hearings before a youth court judge, and the referee possesses all powers and performs all duties of a youth court judge in all hearings he is autho-

to accomplish the aforesaid purposes of examination and evaluation and possible treatment." Accordingly, the August 4, 1987, order granting Foxworth physical custody of Chrissy was held in abeyance until such time as the Youth Court had concluded its proceedings.

In addition to the orders issued in Chancery Court by Judge Dale, other actions relating to Chrissy were taken on December 17 in Marion County Youth Court by Defendant Garland Upton, who served as the Marion County Youth Court referee.[3] Referee Upton appointed Defendants Phillip W. Broadhead and Fred Cooper, the public defenders for Marion County, as guardians ad litem for Chrissy in the Youth Court proceeding. In addition, it was further ordered that temporary physical custody of Chrissy be placed in a private home approved by the Youth Court and that Chrissy be examined by physician Dr. S. Kimble Love and psychologist Dr. Franklin D. Jones, who were then to report the findings of such examinations and evaluations to the court.[4]

Douglas brought Chrissy home to Mississippi on December 17 and she remained in Douglas' custody at his home. On the evening of her return, Foxworth called the Douglas home, but was not allowed to speak with Chrissy. Later that same night, Chrissy asked to speak with Foxworth, and a telephone conversation was arranged. Thereafter, Foxworth, Foxworth's mother Jeanette Hathorn, and a paternal aunt were allowed to visit Chrissy in the Douglas home. During the visit, which lasted approximately forty-five minutes to one hour, Douglas and members of his family were physically present at all times in the room with Chrissy and her relatives. Douglas testified that during the visit, Chrissy was reticent at first, but

that she never showed any signs of fear or dislike toward Foxworth.

On December 18, 1987, Douglas took Chrissy to Judge Dale's chambers, where Judge Dale ordered evaluations of Chrissy by Drs. Jones and Love. Neither Youth Court referee Upton nor the guardians ad litem Broadhead and Cooper were notified or present during this proceeding. At Judge Dale's oral direction, Douglas and Defendant Angela Lacy, the Marion County Welfare Department case worker who had been assigned to the Foxworth matter, took Chrissy to Hattiesburg, Mississippi, for examination. Following the recommendations contained in the reports of Drs. Jones and Love which stated that there was no evidence to suggest that Chrissy had been sexually abused, Judge Dale placed Chrissy that day in the home of her paternal grandmother Hathorn, with unlimited visitation by Foxworth.

On December 23, 1987, Marion County social worker Lacy met with Judge Dale to discuss Lacy's reports concerning visits she had made to the Hathorn home since Chrissy has been placed there. Lacy's notes reflect that Judge Dale informed her that he planned to give Foxworth legal custody of Chrissy. Lacy recommended, and Judge Dale agreed, that Chrissy should remain in Hathorn's care and that Foxworth should continue to have unlimited visitation with her. Judge Dale also assured Lacy that he would enter her report in the pending Youth Court proceeding involving Chrissy.

Also on December 23, 1987, a hearing was held before Judge Weinstein in California concerning a final dismissal of the California petition that had been filed on Chrissy's behalf. Because of reservations as to whether Mississippi authorities had complied with the conditions under which Chrissy was returned to Mississippi, Judge

---

rized to hear. Miss.Code Ann. § 43–21–111(3) (1972).

**3.** Referee Upton had previously represented Foxworth in a prior divorce proceeding, yet this information was never disclosed to any of the parties involved in the Youth Court proceeding. Upton testified that this representation had occurred several years before, had involved routine matters, and that at the time of the youth

court proceeding, he had forgotten his prior representation of Foxworth.

**4.** Both Dr. Love and Dr. Jones had examined Chrissy previously at Foxworth's request. On those occasions, neither doctor had found any evidence to suggest that Chrissy had been sexually abused.

Weinstein refused to dismiss the petition at that time.

On December 28, 1987, Chrissy's maternal grandfather and great-grandmother filed a petition in Chancery Court seeking custody of Chrissy or, in the alternative, visitation rights with her.

On December 30, 1987, referee Upton presided over a hearing on the Youth Court petition that had been filed on Chrissy's behalf. Present at the hearing were County Attorney Dantin, District Attorney Douglas, Judge Dale, guardians ad litem Broadhead and Cooper, and Foxworth's attorney. Chrissy's maternal grandfather and great-grandmother who had earlier filed a Chancery Court petition for custody were not notified of the Youth Court proceeding. Although no record of the Youth Court proceeding was made, the final judgment issued by referee Upton reflects that the evidence offered at the hearing consisted of Dr. Love's report of his December 18, 1987, physical examination of Chrissy which "disclosed no evidence that said child had been sexually abused"; Dr. Jones' report of his December 18, 1987, psychiatric examination of Chrissy which "disclosed no evidence that said child had been sexually abused"; Lacy's investigative report, which reported that a good relationship appeared to exist between Chrissy and her father and recommended that a father-mother relationship be sustained for Chrissy by Foxworth and Hathorn; and Douglas' statement that he had interviewed Chrissy on December 29, 1987, at which time she emphatically denied having been abused or molested in any way by Foxworth. The reports of Drs. Bradford, McCrary, and Russell were not offered into evidence by any party to the Youth Court proceeding. Neither of the guardians ad litem, Broadhead or Cooper, attempted to bring such evidence to the attention of the court, nor did they independently attempt to obtain any evidence regarding the alleged abuse prior to the hearing. In addition, Broadhead and Cooper failed to review any of the documents contained in the court file for the Singley–Foxworth divorce proceeding.

Referee Upton entered a judgment following the hearing in which he remanded the Youth Court petition to the files and entered a report and recommendation to the Chancery Court. Specifically, referee Upton recommended that the Chancery Court modify its custody orders regarding Chrissy as it judged necessary to ensure that Chrissy remained in the legal custody of Foxworth, but was cared for on a day-to-day basis by Hathorn.

On December 31, 1987, Judge Dale entered an addendum to final judgment in the Chancery Court divorce proceeding which implemented the Youth Court's recommendation that Chrissy remain in Foxworth's legal custody and that day-to-day care be provided by Hathorn.

On January 26, 1988, Judge Weinstein entered an order formally appointing Donna Medley guardian ad litem for Chrissy in the California proceeding.

On February 3, 1988, a hearing was held before Judge Dale on the motion of Chrissy's maternal grandfather and great-grandmother seeking custody or visitation rights. In a judgment on the petition entered March 9, 1988, Judge Dale found that the petitioners were not entitled to custody of Chrissy. In addition, Judge Dale ruled that permissive visitation might be appropriate between Chrissy and the petitioners at some point in the future, but that such visitation would not be allowed until the Court was satisfied that there no longer existed any reasonable threat to Chrissy's safety, stability, and normalcy because of the continuing activities of the California children's group which continued to prosecute a petition on Chrissy's behalf in the California court.

On February 12, 1988, Judge Dale entered a final status order in the divorce proceeding. In that order, Judge Dale noted that, based on Judge Weinstein's decision to decline jurisdiction over proceedings concerning Chrissy, the Mississippi court would consider any directions, instructions, requirements, and conditions imposed by the California court to be of no legal force. In addition, Judge Dale asked the Califor-

nia court to dismiss the petition filed in that state in Chrissy's behalf.

On July 8, 1988, the instant action was filed pursuant to 42 U.S.C. § 1983. In the Complaint, Plaintiff alleged that Defendants violated and/or were violating Chrissy's substantive and procedural due process rights as guaranteed by the fourteenth amendment to the United States Constitution. Plaintiff also alleged violations of federal statutory rights conferred upon Chrissy by the Child Abuse Prevention and Treatment Act, 42 U.S.C. § 5101 *et seq.* ("CAPTA"). Finally, Plaintiff's Complaint contained certain pendent state law claims.

On August 26, 1988, this Court dismissed Plaintiff's suit pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, finding that the federal suit was "inextricably intertwined" with the state court proceeding. The United States Court of Appeals for the Fifth Circuit reversed that ruling, however, and directed this Court to appoint a guardian ad litem or "next friend" for Chrissy or enter a finding that Chrissy's interests were adequately protected without such an appointment. *Chrissy F. v. Mississippi Dept. of Public Welfare, et al.,* 883 F.2d 25, 27 (5th Cir.1989). Following a contested evidentiary hearing on December 13, 1989, this Court appointed Medley as Chrissy's next friend. Following discovery in this matter, Defendants filed various motions to dismiss and/or for summary judgment, largely premised upon the eleventh amendment to the United States Constitution and claims of absolute and qualified immunity. On April 27, 1990, this Court granted in part and denied in part Defendants' motions. Specifically, the Court found that the eleventh amendment rendered the state and all of the individual Defendants immune from damages in their official capacities; that the guardians ad litem were entitled to absolute immunity; that Defendant Douglas was not entitled to absolute immunity as to all claims asserted in the Complaint; and that the other state officials were not conclusively entitled to qualified immunity. On appeal, the United States Court of Appeals for the Fifth Circuit affirmed this Court's ruling in all re-

spects. *Chrissy F. v. Mississippi Dept. of Public Welfare, et al.,* 925 F.2d 844, 850 (5th Cir.1991). Subsequently, a trial on the merits was commenced in this Court on June 10, 1991.

Since her return to Mississippi in December of 1987, Chrissy has been living in the homes of her paternal grandmother and her father. Foxworth works a rotating schedule as an off-shore oil worker. During the periods that he is working, Chrissy lives with her grandmother at her home. When Foxworth is not working, both Chrissy and her grandmother stay with Foxworth at his home. During the time that Angela Lacy supervised the situation on a regular basis, she reported that Chrissy was adjusting well and no problems were apparent. Chrissy's grandmother testified that Chrissy has adjusted well, is liked by her schoolmates, makes good grades, and attends church with her and Foxworth on a regular basis.

## II. CONCLUSIONS OF LAW

The following issues of law are presented in the instant case: (a) whether Plaintiff has established a claim for relief under 42 U.S.C. § 1983 as to all named defendants; (b) whether Plaintiff has established a deprivation of Chrissy's substantive due process rights to liberty and personal safety and to have access to courts as guaranteed by the fourteenth amendment to the United States Constitution; (c) whether Plaintiff has established a violation of Chrissy's procedural due process rights as guaranteed by the fourteenth amendment to the United States Constitution; (d) whether a private right of action that may be enforced pursuant to section 1983 exists under the Child Abuse Prevention and Treatment Act, 42 U.S.C. § 5101 *et seq.* ("CAPTA") and, if so, whether Plaintiff has established a violation of any such rights that CAPTA may have conferred upon Chrissy; and (e) whether Plaintiff has established a right to recover on pendent state law claims asserted in the Complaint.

### A. Elements of a Section 1983 Action

Before addressing the substantive claims asserted by Plaintiff, the Court, in light of

the fact that all of Plaintiff's claims with the exception of certain pendent state law claims have been brought pursuant to section 1983, will initially consider whether Plaintiff has established a claim for relief under section 1983 as to certain of the named defendants. 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 expressly authorizes a court to grant relief only when a party's federally protected rights have been violated by a person acting under color of state law. Thus, in determining whether a section 1983 claim has been properly asserted, the court must consider who is a "person" subject to suit under section 1983 and when a deprivation of federal rights occurs under "color of state law."

█ Keeping the above noted factors in mind, the Court now considers whether the requisites for maintaining a section 1983 action have been met as to certain of the defendants named in this action. With regard to the issue of who constitutes a "person" that may properly be named a section 1983 defendant, the United States Supreme Court held in *Will v. Michigan Department of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989), that states and state agencies are not considered "persons" subject to suit under section 1983. *See also Howlett v. Rose*, 496 U.S. 356, 110 S.Ct. 2430, 2437, 110 L.Ed.2d 332 (1990) (noting that traditional notions of eleventh amendment immunity support conclusion that states and state agencies are not subject to suit under Section 1983); *Weller v. Department of Social Services*, 901 F.2d 387, 398 (4th Cir. 1990). The Court therefore finds that a section 1983 action cannot be maintained against the Mississippi Department of Public Welfare. Accordingly, that Defendant is hereby dismissed from this lawsuit.

The Court next considers whether Plaintiff has established that certain of the Defendants were acting "under color of state law" at the time that the alleged deprivations of rights occurred.

█ Public employees act under color of state law while they are acting in their official capacities or while they are exercising their responsibilities pursuant to state law. *See, e.g., West v. Atkins*, 487 U.S. 42, 50, 108 S.Ct. 2250, 2256, 101 L.Ed.2d 40 (1988); *DeYoung v. Patten*, 898 F.2d 628, 631 (8th Cir.1990). Accordingly, the Court finds that the alleged actions of Defendants Brittian, Dale, Upton, Douglas, Werbey, Lacy, and Whitt clearly fall within the parameters of acts considered to be taken under color of state law. The Court finds, however, that Defendants Cooper and Broadhead should be distinguished from other public official Defendants. In *Meeker v. Kercher*, 782 F.2d 153 (10th Cir.1986), the court found that a guardian ad litem, although a public employee, was not acting under color of state law for purposes of section 1983 while representing a minor in a state court proceeding concerning abuse or neglect. Because a guardian ad litem owes a duty to the minor to promote and protect the minor's best interests and must exercise independent professional judgment in carrying out that duty, a guardian ad litem does not function as a representative of the state while acting on behalf of his client. *Meeker*, 782 F.2d at 155. Accordingly, the *Meeker* court concluded that a guardian ad litem is not acting under color of state law for purposes of section 1983. *Id.; see also Clay v. Friedman*, 541 F.Supp. 500, 503–04 (N.D.Ill.1982). This Court likewise concludes that, based on the reasoning expressed in *Meeker* and similar cases, Defendants Cooper and Broadhead were not acting under color of state law with regard to incidents relevant to this controversy and should therefore be dismissed as defendants in this lawsuit.

■ Finally, the Court considers whether Plaintiff has satisfied the color of state law requirement as to Defendant Foxworth. Plaintiff contends that Foxworth, while nominally a private party, became a state actor for purposes of section 1983 because of his involvement, through his attorneys, in the California court proceeding and in the Youth Court proceeding that took place in Marion County, Mississippi. While this Court is cognizant of the general precept that private individuals who jointly engage with state actors in a prohibited action may be considered acting under color of state law for purposes of section 1983, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970) (citing *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966)), the Court is also cognizant of numerous rulings which have held that a private party does not act under color of state law merely because of his participation in a judicial proceeding. *See Brisco v. LaHue*, 460 U.S. 325, 329–30, 103 S.Ct. 1108, 1112–13, 75 L.Ed.2d 96 (1983); *Dunwoody Homeowners Assoc. v. DeKalb County*, 887 F.2d 1455, 1461 (11th Cir.1989); *Tunstall v. Office of Judicial Support of Court of Common Pleas*, 820 F.2d 631, 634 (3rd Cir.1987); *Earnest v. Lowentritt*, 690 F.2d 1198, 1200 (5th Cir. 1982); *Mabe v. Galveston Park Bd.*, 635 F.Supp. 105, 107 (S.D.Tex.1986). Based on the rationale expressed in these cases, the Court concludes that Defendant Foxworth was not acting under color of state law merely because of his involvement in the court proceedings at issue here.[5] Plaintiff contends that the holding in *Edmonson v. Leesville Concrete Co.*, 500 U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) requires a finding of state action on the part of Defendant Foxworth. The Court cannot agree. In *Edmonson*, the United States Supreme Court found state action on the part of a private litigant because of that litigant's exercise of peremptory challenges in a civil proceeding. Noting that peremptory challenges could not be exercised without the overt, significant assistance of the court and that exercise of the peremptory challenge involved the performance of a traditional governmental function in that the selection of a jury was in essence the selection of individuals who would exercise the power of the court, the Court concluded that the exercise of peremptory challenges was of such a governmental character that it could be deemed state action. *Edmonson*, 500 U.S. at ——, 111 S.Ct. at 2082–87, 114 L.Ed.2d at 673–78. The Court does not find those same factors to be present in the instant matter. Plaintiff has failed to establish any overt, significant assistance to Foxworth by state officials with regard to the judicial proceedings at issue other than the lone fact that the state provided a forum in which such proceedings could occur. The mere fact that Foxworth participated in the proceedings is wholly insufficient to characterize him as a state actor. Additionally, the Court finds that Plaintiff has failed to produce any evidence which suggests that Foxworth performed any act which could even remotely be construed as a traditional governmental function. Unlike *Edmonson*, where a private litigant actively participated in selecting those individuals who as a jury would ultimately exercise the powers and authority of the court, the facts here suggest only that Foxworth was given his day in court. This Court simply does not read *Edmonson* as an opening of the section 1983 door against all litigants in state court judicial proceedings merely because of their participation in lawsuits. The Court concludes that Foxworth is not a state actor for purposes of section 1983 and should therefore be dismissed as a Defendant in this lawsuit.

### B. Substantive Due Process Claims

The fourteenth amendment to the United States Constitution provides that "[n]o State shall ... deprive a person of life,

---

5. Foxworth was a party of record in the chancery court divorce and custody case. Pursuant to Miss.Code Ann. § 43–21–203(6) (1972), Foxworth was allowed to appear as an interested party in the youth court proceeding. Although the exact nature of Foxworth's status in the California court proceeding is unclear, the record demonstrates that Foxworth's attorney was allowed to participate in that proceeding.

liberty or property without due process of law." U.S. Const. amend. XIV § 1. In order to establish a substantive due process claim under section 1983, Plaintiff must assert a recognized liberty or property interest within the purview of the fourteenth amendment, *see Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972); *Neuwirth v. Louisiana State Board of Dentistry*, 845 F.2d 553, 557 (5th Cir.1988), and that she was intentionally or recklessly deprived of that interest under color of state law. *See Daniels v. Williams*, 474 U.S. 327, 327, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 347–48, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986); *Brantley v. Surles*, 718 F.2d 1354, 1357 (5th Cir.1983).

(1) *liberty interests and constitutionally protected rights to personal safety*

Plaintiff initially asserts a substantive due process claim on the basis that her liberty interest in remaining free from personal harm has been intentionally and/or recklessly violated by Defendants Dale, Douglas, and Brittian. By affirmatively acting to obtain custody of Chrissy from California authorities and then allowing an allegedly inadequate and incompetent evaluation of the allegations of abuse and allowing Foxworth access to Chrissy, Plaintiff contends that these Defendants rendered Chrissy unable to care for herself and rendered her more vulnerable to the danger of abuse by Foxworth, thereby violating Chrissy's liberty interest in personal safety as guaranteed by the due process clause.

Analysis of a claim that state officials failed to adequately protect an individual from a risk of harm must begin with *De-Shaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *De-*

*Shaney*, the Supreme Court determined that the due process clause of the fourteenth amendment does not impose an obligation upon public authorities to protect children from parental abuse, even when they know that a child is threatened with harm and may have undertaken some protective measures on the child's behalf. *De-Shaney*, 489 U.S. at 201–02, 109 S.Ct. at 1006. Because the due process clause operates as a limitation on the power of the state to act and does not serve as a guarantee of certain minimal levels of safety and security, the Court concluded that the provision could not be extended to impose an affirmative obligation on the state to protect individuals from the risk of harm posed by other private citizens. *Id.* at 195–96, 109 S.Ct. at 1003.

*DeShaney* itself recognized that certain exceptions may exist to this general principle of no duty to protect, and it is these exceptions that Plaintiff asserts as a basis for her substantive due process claims. It has long been recognized, and the *DeShaney* court reaffirmed, that the state does have a constitutional obligation to protect and care for individuals that are in the custody of the state.[6] *See id.* at 198–200, 109 S.Ct. at 1005; *see also Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983) (holding that due process requires state to provide medical care to suspects in police custody); *Youngberg v. Romeo*, 457 U.S. 307, 324, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982) (holding that state has an affirmative duty under substantive component of due process clause to provide involuntarily committed mental patients with services that are necessary to ensure their safety); *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (holding that state is

**6.** Plaintiff has continually stressed to the Court that another exception to the general principle of no duty to protect exists where a "special relationship" exists between the state and the individual in question. Where the state knows that an individual faces a particular risk of harm and in fact may have undertaken certain actions to protect the individual from that harm, Plaintiff asserts that a "special relation-

ship" arises which creates a duty on the part of the state to protect the individual from the known danger. The *DeShaney* court flatly rejected this argument, noting that a duty to protect under these circumstances can arise only where the custody exception itself is applicable. *DeShaney*, 489 U.S. at 197–98, 109 S.Ct. at 1004–05.

required under due process to provide prisoners with adequate medical care). Because the deprivation of rights in *DeShaney* occurred after the state had relinquished custody of the child at issue, the Court concluded that the duty to protect which may arise in a custodial setting no longer existed, thus relieving the state of its duty to ensure the safety and well-being of a private individual. Most relevant for our purposes, however, are the circumstances which the Court noted in determining that the state's duty to protect had ceased with the relinquishment of custody:

> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that which he would have been in had it not acted at all.

*DeShaney*, 489 U.S. at 201, 109 S.Ct. at 1006. Based on this language, Plaintiff asserts that, although state custody of Chrissy was relinquished soon after her return from California, those Defendants responsible for her return to Mississippi still retained a duty to protect her because they enhanced the potential for harm by removing her from psychological and medical services she could have received in California and by placing her in closer proximity to her alleged abuser. This Court does not agree. While the state may in fact hold a duty towards those individuals it has placed at an increased risk of harm and, in effect, "must protect those it throws into snake pits," *Walker v. Rowe*, 791 F.2d 507, 511 (7th Cir.1986), Plaintiff has failed to establish that Chrissy actually suffered any concrete injury or harm as a result of her return to Mississippi or to the custody of her grandmother and father. Plaintiff has never contended at any point in this proceeding that Chrissy was subjected to any sexual or physical abuse subsequent to her return to Mississippi, and this Court finds no evidence to even remotely suggest that any such instances may have occurred.

As to psychological harm, testimony has been presented to this Court which establishes in general terms that sexually abused children may suffer psychological injury if returned to the custody of the alleged abuser or if denied adequate counseling and treatment subsequent to the abuse. This Court has no doubt that such damage does indeed occur. The facts, however, do not demonstrate this to be the result in the instant matter. The evidence indicates that, following a period of observation and counseling by social workers and psychologists, Chrissy has developed into a normal, well adjusted child by all outward manifestations. She has excelled as a student since starting school and exhibits no difficulty in relating to other children. She has likewise developed a strong attachment to her family, particularly her maternal grandmother, and does not exhibit any discomfort with or disturbance under her current living arrangement or family structure. Finally, the Court notes with great significance that psychologists treating Chrissy have determined that she is no longer in need of treatment and have in fact released her from their care. On the basis of this evidence, the Court simply cannot find that Chrissy's return to Mississippi placed her at an enhanced risk of physical or psychological harm since no such harm has actually occurred. Accordingly, the Court concludes that Plaintiff has failed to establish the deprivation of a liberty interest in personal safety within the purview of the due process clause.

#### (2) *right of access to courts*

The right to present a claim before a court of law is basic to our system of government and is, consequently, one of the most fundamental rights protected by the United States Constitution. As characterized by the United States Supreme Court in *Chambers v. Baltimore & Ohio Railroad*, 207 U.S. 142, 28 S.Ct. 34, 52 L.Ed. 143 (1907),

> [t]he right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is

one of the highest and most essential privileges of citizenship, and must be allowed by each state to the citizens of all other states to the precise extent that it is allowed to its own citizens. Equality of treatment in this respect is not left to depend upon comity between the states, but is granted and protected by the Federal Constitution.

*Chambers,* 207 U.S. at 148, 28 S.Ct. at 35 (citations omitted). While the *Chambers* court viewed the right of access to courts as one of the privileges and immunities accorded under Article IV of the Constitution, other courts have determined the right to also be grounded in the first amendment right to petition[7] and in the due process clause of the fourteenth amendment.[8]

▇ The right of access to courts requires that an individual have "adequate, effective, and meaningful" access to court procedures. *Ryland v. Shapiro,* 708 F.2d 967, 972 (5th Cir.1983); *see also Bounds v. Smith,* 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977); *Rudolph v. Locke,* 594 F.2d 1076, 1078 (5th Cir.1979). On that basis, courts have found various acts of delay in court proceedings and suppression or destruction of evidence to constitute an impermissible burden on the right of access to courts. *See Germany v. Vance,* 868 F.2d 9, 15 (1st Cir.1989) (intentional suppression of evidence infringes upon protected right of access to courts); *Jackson v. Procunier,* 789 F.2d 307, 311 (5th Cir.1986) ("Any deliberate impediment to access, even a delay of access, may constitute a constitutional deprivation"); *Bell v. Milwaukee,* 746 F.2d 1205, 1260–63 (7th Cir.1984) (withholding evidence that would allow an individual to prove his claim violates right of access); *Ryland v. Shapi-*

*ro,* 708 F.2d 967, 973 (5th Cir.1983) (conduct which interferes with the right to institute a suit constitutes actionable impediment to right of access); *Rheuark v. Shaw,* 628 F.2d 297, 302 (5th Cir.1980) (conduct by state officers which delays appellate process may prejudice right of access to courts); *McCray v. Maryland,* 456 F.2d 1, 6 (4th Cir.1972) (right of access violated where court official, by refusal or neglect, impedes the filing of court papers); *Sigafus v. Brown,* 416 F.2d 105, 107 (7th Cir. 1969) (destruction of legal papers necessary for appeal constitutes denial of access); *Crews v. Petrosky,* 509 F.Supp. 1199, 1204 (W.D.Pa.1981) (allegation that clerk of court delayed filing of a petition for appeal may state valid claim for violation of right of access).

Plaintiff contends that Chrissy's fundamental right of access to courts has been impermissibly abridged by various acts of Defendants in this matter. Specifically, Plaintiff asserts that the failure to timely institute proceedings in the proper judicial forum and the failure of various Defendants to investigate allegations of abuse and to present evidence of abuse to court officials constituted a denial of Chrissy's right to adequate, effective, and meaningful court proceedings.

a. jurisdictional issues as between chancery court and youth court

The primary argument advanced by Plaintiff in connection with the right of access to courts involves Plaintiff's contention that Judge Dale, by retaining chancery jurisdiction over the custody proceedings after allegations of child abuse had been made, prevented and/or delayed Chrissy's access to a youth court proceeding where Plaintiff claims jurisdiction over proceedings involving an abused child properly

---

**7.** *See California Motor Transportation Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972); *NAACP v. Button,* 371 U.S. 415, 428–29, 83 S.Ct. 328, 335–36, 9 L.Ed.2d 405 (1963); *Ryland v. Shapiro,* 708 F.2d 967, 971–72 (5th Cir.1983); *Coastal States Marketing, Inc. v. Hunt,* 694 F.2d 1358, 1363 (5th Cir.1983); *Wilson v. Thompson,* 593 F.2d 1375, 1387 (5th Cir.1979); *American Civil Liberties Union, Inc. v. Mabus,* 719 F.Supp. 1345, 1358 (S.D.Miss.1989).

**8.** *See Bounds v. Smith,* 430 U.S. 817, 821–22, 97 S.Ct. 1491, 1494–95, 52 L.Ed.2d 72 (1977); *Boddie v. Connecticut,* 401 U.S. 371, 377–78, 91 S.Ct. 780, 785–86, 28 L.Ed.2d 113 (1971); *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974); *Mitchum v. Purvis,* 650 F.2d 647, 648 (5th Cir.1981); *Rudolph v. Locke,* 594 F.2d 1076, 1078 (5th Cir.1979).

lay.[9] Noting Mississippi law vests "exclusive original jurisdiction in all proceedings concerning ... an abused child" with the youth court, *see* Miss.Code Ann. § 43–21–151 (1972), Plaintiff argues that Judge Dale had no jurisdiction over the abuse allegations when they were first raised in August, 1985. Because Judge Dale failed to refer the matter to the youth court at that time and, indeed, continued to entertain the custody proceedings and abuse allegations in chancery court through December, 1987, Plaintiff contends that Judge Dale impermissibly delayed Chrissy's right to meaningful and sufficiently prompt youth court proceedings. As a corollary to this argument, Plaintiff further contends that the Marion County Welfare Department and the Hancock County Welfare Department interfered with Chrissy's right of adequate, effective, and meaningful access to courts by delaying commencement of a youth court proceeding during the time that Judge Dale was purportedly exercising chancery jurisdiction over the abuse allegations.

Conversely, Judge Dale, the Marion County Welfare Department and the Hancock County Welfare Department assert that the chancery court is constitutionally and statutorily vested with the authority to hear a custody modification matter involving a minor with regard to whom it has previously issued custody decrees. Noting that the chancery court is constitutionally vested with full jurisdiction in divorce and alimony proceedings and is also statutorily authorized to issue all decrees pertaining to child custody disputes that may arise during the course of a divorce proceeding and to retain exclusive original jurisdiction over the custody issue once an original decree has been issued, these Defendants contend that the chancery court held exclusive jurisdiction over the custody proceeding in which abuse allegations were raised, thus negating the inference that chancery proceedings impermissibly delayed any right

that Chrissy had to have the abuse allegations heard exclusively in youth court.

██ Upon an examination of relevant legal authority, the Court concludes that Chrissy's right of access to courts was not violated when Judge Dale retained chancery jurisdiction over the custody proceedings in which allegations of abuse were made rather than transferring the matter to youth court. The Mississippi Constitution provides that the chancery court "shall have full jurisdiction" in divorce and alimony proceedings. Miss. Const. art. 6, § 159. As a natural consequence of this constitutionally vested jurisdiction, chancery courts are statutorily authorized to issue all decrees pertaining to child custody disputes that may arise in the course of divorce proceedings.

> Where a divorce shall be decreed from the bonds of matrimony, the court may, in its discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders touching the care, custody, and maintenance of the children of the marriage....

Miss.Code Ann. § 93–5–23 (1972). Once a chancery court obtains jurisdiction over the custody issue by issuing the original custody decree, it retains continuing jurisdiction over that issue and can issue subsequent modifications to that decree as any material change in circumstances may warrant. *See* Miss.Code Ann. § 93–5–23 (1972) (chancery court retains authority to modify previously issued custody decrees or to issue new decrees as required). Any hearings for custody modification that occur subsequent to the original custody proceedings are not considered separate and independent proceedings, but rather are supplementary to and operate as a continuation of the original chancery action. *See Morris v. Morris*, 245 So.2d 22, 24 (Miss.1971) (noting that jurisdiction over a custody modification hearing had attached in chancery court on the date that the original custody proceeding had taken place); *Ladner v. Lad-*

---

**9.** This subsection deals with the period of time before Chrissy's return from California during which Judge Dale was conducting visitation and custody hearings between Singley and Fox-

worth. The issue of whether the exercise of jurisdiction by the chancery court after Chrissy returned from California is addressed, *infra*, Section II.A(2)(b).

*ner,* 206 So.2d 620, 624–25 (Miss.1968) (holding that jurisdiction obtained by chancery court over the custody issue is continuous in nature). Although section 93–5–23 does not expressly provide that the jurisdiction acquired by the chancery court under such circumstances is exclusive, the Mississippi Supreme Court has held that chancery jurisdiction over custody proceedings is continuous and exclusive, thus precluding any other state court from acquiring or exercising jurisdiction over the same subject matter. *Ladner,* 206 So.2d at 624–25.

 Based on the foregoing analysis, the Court concludes that the chancery court acquired exclusive, continuing jurisdiction over all custody proceedings regarding Chrissy when the original custody decree was issued in November, 1984. The custody modification hearing that took place in August, 1985, at which allegations of sexual abuse were first raised was merely a continuation of the original custody action over which the chancery court continued to exercise exclusive jurisdiction. Under these particular circumstances, the Court concludes that, while Miss.Code Ann. § 43–21–151 (1972) states that the youth court shall have exclusive original jurisdiction over all proceedings concerning an abused child, that staute cannot be applied where exclusive jurisdiction over a proceeding involving allegations of abuse has already vested in a chancery court through a custody matter involving that child. The term "exclusive jurisdiction," as embodied in section 43–21–151, denotes the power which a court exercises over an action to the exclusion of all other courts. Black's Law Dictionary 507 (5th ed. 1979). Likewise, the term "original jurisdiction" as embodied in section 43–21–151 is defined as jurisdiction to take cognizance of a cause at its inception. *Id.* at 991. Where, as in the instant matter, allegations of abuse arise during proceedings over which a chancery court is already exercising continuous and exclusive jurisdiction, the Court finds that there is no opportunity for the youth court to exercise its exclusive original jurisdiction conferred under section 43–21–151 because the exclusive jurisdiction of another court

has already precluded the ability of the youth court to take cognizance of the claim at its inception to the exclusion of all other courts. Alternatively stated, the Court finds that the exclusive original jurisdiction of the youth court to hear proceedings involving an abused child as conferred by section 43–21–151 does not apply and cannot be effectuated where the proceeding has already fallen under the exclusive jurisdiction of a chancery court.

Although dealing with statutory provisions that are not at issue in this lawsuit, the Mississippi Supreme Court in *Reynolds v. Riddell,* 253 So.2d 834 (Miss.1971) had occasion to consider how the continuous and exclusive nature of chancery jurisdiction affects the jurisdiction that may be statutorily conferred on other courts. In *Reynolds,* a custody decree that had been issued by one chancery court was subsequently modified by a decree from the chancery court of another county in which the child actually resided. Although a Mississippi statute expressly provided that custody issues could be determined by the chancery court of the county in which the child resided, the court found that the exclusive and continuous nature of the jurisdiction acquired by the court that had issued the original decree precluded application of the statute. *Reynolds,* 253 So.2d at 836. Because the inherent nature of chancery jurisdiction over custody issues did not allow such issues to be divested from the jurisdiction of the chancery court issuing the original decree, the *Reynolds* court concluded that the state statute allowing custody issues to be heard in the county where the child resided could only be applied where no prior chancery court adjudication existed. *Id.* at 836–37. Likewise, this Court concludes that, because of the continuous and exclusive nature of chancery jurisdiction over custody issues, section 43–21–151 which grants the youth court exclusive original jurisdiction over all proceedings involving an abused child can not be applied where allegations of abuse are raised in the course of custody proceedings and chancery court jurisdiction over the

custody issue is already being exercised.[10]

Finally, the Court notes an amendment that has been made to the chancery jurisdictional statute which supports this Court's conclusion that chancery courts retain jurisdiction to hear abuse allegations where they are raised in the context of custody modification proceedings.

> Whenever in any proceeding in the chancery court concerning the custody of a child a party alleges that the child whose custody is at issue has been the victim of sexual or physical abuse by the other party, the court may, on its own motion, grant a continuance in the custody proceeding only until such allegation has been investigated by the Department of Public Welfare.... The Department of Public Welfare shall investigate such allegation and take such action as it deems appropriate and as provided in such cases in the Youth Court Law ... or under the laws establishing family courts.

> If after investigation by the Department of Public Welfare or final disposition by the youth court or family court allegations of child abuse are found to be without foundation, the chancery court shall order the alleging party to pay all court costs and reasonable attorney's fees incurred by the defending party in responding to such allegation.

Miss.Code Ann. § 93–5–23 (Supp.1991). Although this language was added to section 93–5–23 subsequent to the events of this case, the Court finds it instructive of legislative intent in dealing with situations similar to the one presently before the Court. Because this language clarifies the options a chancellor holds at his disposal when confronted with abuse allegations in the context of custody proceedings and makes it clear that the chancellor would be within the bounds of his judicial discretion in ordering the matter turned over to youth court officials, the Court finds that the amendatory language impliedly concedes that, in the first instance, the chancellor

does indeed hold continuing, exclusive jurisdiction over custody proceedings even where allegations of child abuse have been made. The Court further notes that it finds the amendatory language to be a clarification of, rather than a substantive change to, section 93–5–23. If this language was intended to be a substantive change to section 93–5–23, it could be argued that, prior to the amendment, exclusive jurisdiction over these matters rested with the youth court. The Court finds that under such circumstances it would have been necessary to amend the youth court jurisdictional statute, section 43–21–151, in conjunction with section 93–5–23 to accomplish a substantive jurisdictional change. The Court notes, however, that section 43–21–151 was not amended at the time that the new language was added to section 93–5–23. Accordingly, the Court concludes that the amendment to section 93–5–23 was not intended to effect a jurisdictional change vis-a-vis chancery and youth courts, but rather was intended to clarify the nature of chancery jurisdiction which has always existed under section 93–5–23.

Based on the foregoing analysis, the Court concludes that the chancery court was exercising continuous, exclusive jurisdiction over a custody modification proceeding at the time that allegations of sexual abuse were first raised. The exclusive nature of that jurisdiction precluded application of Miss.Code Ann. § 43–21–151 (1972), which only grants the youth court exclusive original jurisdiction over proceedings involving an abused child. Because it would have been impossible for the youth court to exercise exclusive original jurisdiction over a proceeding which had already fallen under the exclusive jurisdiction of the chancery court, the Court concludes that Chrissy had no right pursuant to section 43–21–151 to have the abuse allegations heard exclusively in youth court. The Court therefore finds that the failure to transfer the proceeding from chancery to

---

**10.** This Court is not faced with and does not now decide the issue of whether a youth court can exercise jurisdiction over an abused child where that child has previously been the subject of a custody proceeding in chancery court, but the allegations of abuse do not arise in the context of a custody proceeding and the custody issue is not in an active status.

youth court upon the making of the initial allegation of abuse by Singley in a custody hearing did not interfere with Chrissy's right to adequate, effective, and meaningful access to courts and, accordingly, that Defendants Dale, the Marion County Welfare Department and the Hancock County Welfare Department did not violate Chrissy's constitutionally protected rights on this basis.

b. inaction and affirmative activity

In addition to the jurisdictional argument noted above, Plaintiff also asserts that Chrissy's right of access to courts has been violated by various acts of Defendants which resulted in a failure to investigate allegations of abuse, a failure to present all relevant evidence of abuse in the youth court proceeding, and a failure to ensure that the youth court hearing was an adequate, meaningful judicial procedure once employed.

Initially, the Court notes that many of the claims asserted by Plaintiff in this regard are based on Defendants alleged violations of the Mississippi Youth Court Law, Miss.Code Ann. § 43–21–101 *et seq.* However, a violation of state law, without more, does not establish an entitlement to relief under section 1983. *See Kompare v. Stein,* 801 F.2d 883, 888 (7th Cir.1986). Clearly, section 1983 creates a federal cause of action only for the deprivation of a right secured by the United States Constitution or by federal law. Because issues of compliance with state law would be relevant in this context only to the extent that Chrissy is able to establish a Roth-type entitlement under substantive state law provisions, *see Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the Court concludes that all right of access arguments which find their genesis in state law are more properly analyzed as procedural due process claims, *infra* Section II.C.

The Court first considers a group of claims which assert violations of Chrissy's right of access to courts because of the failure of certain Defendants to take action which Plaintiff contends was necessary to secure Chrissy's constitutionally protected rights. Specifically, Plaintiff asserts that Defendants Douglas, Brittian, Lacy, Whitt, and Werbey failed to adequately investigate allegations that Chrissy had been sexually abused. Plaintiff further contends that Defendants Dale, Douglas, and Brittian failed to disclose relevant evidence of sexual abuse during the youth court proceeding, all in violation of Chrissy's fundamental right of access to courts.

As this Court noted earlier in its analysis of Chrissy's liberty interest in remaining free from personal harm, the fourteenth amendment due process clause is a charter of negative rather than positive liberties. *See Jackson v. Joliet,* 715 F.2d 1200, 1203 (7th Cir.1983) (citing *Harris v. McRae,* 448 U.S. 297, 318, 100 S.Ct. 2671, 2688, 65 L.Ed.2d 784 (1980); *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982)). As such, it serves to protect citizens from the affirmative acts of government. It does not function as a guarantee that basic services will be provided by state government, nor does it require state government to affirmatively assist particular individuals in securing those rights to which they are entitled under the Constitution.

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens.... The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.... [I]ts language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means....
>
> Consistent with these principles, our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.

*DeShaney,* 489 U.S. at 195–96, 109 S.Ct. at 1003 (citations omitted); *see also Webster v. Reproductive Health Services,* 492 U.S. 490, 507–08, 109 S.Ct. 3040, 3050–51, 106

L.Ed.2d 410 (1989); *Griffith v. Johnston,* 899 F.2d 1427, 1438 (5th Cir.1990).

 Consistent with this reading of the due process clause, the Court concludes that state actors have no general duty to affirmatively aid individuals in securing their fundamental right of access to courts. While a state certainly may not act to impede an individuals exercise of this fundamental right, this Court can find no precedent in right of access cases or in due process analysis generally which suggests that state actors must affirmatively act to secure an individual's rights as guaranteed under the fourteenth amendment. Accordingly, the Court concludes that, as to those claims asserting a deprivation of the right of access to courts based upon the failure of certain of the Defendants to take affirmative action on behalf of Chrissy, Plaintiff has failed to establish a right of recovery on that basis.

 The Court next considers the category of claims through which Plaintiff asserts that Chrissy was deprived of her fundamental right of access to courts by the affirmative conduct of various Defendants. Initially, the Court notes that several of those claims relate to violations of the California court order which Plaintiff alleges have occurred. Specifically, Plaintiff alleges that Defendants Dale, Douglas, Brittian, Lacy, and Whitt failed to comply with specific mandates of the California court, the result of which was to deprive Chrissy of her right to adequate court proceedings upon her return to Mississippi. To the extent that Plaintiff's argument is premised upon the assertion that the mere failure to comply with a court order constitutes a violation of the right of access per se, the Court finds Plaintiff's premise untenable. The issue before this Court is whether Defendants have violated the constitutional standard for access to court proceedings, not whether Defendants have violated the particulars of a state court order.[11] Only where the conduct which is in violation of the state court order would also constitute a violation of the constitutional standard is this Court permitted to find that an injury cognizable under section 1983 has occurred.

 Turning to the particulars of the conduct which Plaintiff alleges violated the California order and considering whether such conduct violated constitutionally prescribed standards regarding the right of access, the Court concludes that Plaintiff has failed to establish any violation of Chrissy's rights on the basis of these particular acts.[12] With regard to acts which allegedly violated the provisions of the California order regarding physical and psychological evaluation of Chrissy and her placement in a neutral environment with no contact by her father upon her return to Mississippi, the Court finds that, even assuming violations of these provisions may have occurred, such acts did not affect or in any manner impinge upon Chrissy's right of access to courts. The Court finds that the issues addressed in these provisions of the order were in no way connected with or relevant to whether Chrissy received ade-

---

11. To the extent that Plaintiff wishes to enforce particular provisions of the California court order, this Court notes that contempt proceedings in the forum issuing the order would be the appropriate remedy. While this Court would be compelled to address the issue of noncompliance with the California order in this section 1983 action if Plaintiff had asserted a constitutionally protected property interest in the particular provisions of the order, *See Coffman v. Wilson Police Department,* 739 F.Supp. 257, 264–65 (E.D.Pa.1990), Plaintiff has not asserted any such claim, and that issue is therefore not properly before this Court.

12. A great deal of testimony taken in this action addressed the meaning of Judge Weinstein's order and Defendant's compliance with those directives. Defendants contend that Chrissy had been placed in a neutral setting upon her return to Mississippi (in Douglas' home), that she was physically and psychologically examined upon her return, that a guardian ad litem was appointed for her, that a youth court hearing was held, and that the order meant that no unsupervised contact with Chrissy by Foxworth was to be allowed until further court instructions were received. If this reading of the order is correct, the Court finds that, technically, there was compliance with the California order. Plaintiff, on the other hand, contended that Judge Weinstein intended for Chrissy to be isolated from Foxworth for an extended period of time during which extensive examinations would be performed.

quate access to a court proceeding. With regard to allegations that the Defendants failed to comply with the California provisions relating to the appointment of a guardian ad litem and the initiation of a youth court petition, the Court finds the evidence in this matter to establish that those conditions, while directly related to the issue of whether Chrissy had adequate, meaningful access to court proceedings, were in fact met. Accordingly, no violation of Chrissy's right of access occurred on this basis.

The Court next considers affirmative conduct surrounding the December 18, 1987, proceedings conducted by Judge Dale to determine whether such activity interfered with Chrissy's right of access to courts. As this Court has previously noted in its factual findings, Judge Dale issued a temporary order in the divorce proceedings on December 17, 1987, the day of Chrissy's return from California to Mississippi, which stated that the chancery court deemed it to be in Chrissy's best interest to have her physical, mental, and emotional state evaluated "by competent professionals and under the direction of the Court" prior to physical custody of Chrissy being turned over to Foxworth. Judge Dale further ordered that it would be most expedient "to utilize the machinery of the Youth Court Division of this Court to accomplish the aforesaid purposes of examination and evaluation and possible treatment." Finally, Judge Dale ordered that the August 4, 1987, order granting Foxworth physical custody of Chrissy be held in abeyance until such time as the youth court had concluded its proceedings.

Concurrent with the actions being taken by Judge Dale in chancery court, other action related to Chrissy was being taken on December 17 in youth court by Defendant Garland Upton who served as the Marion County Youth Court referee. Referee Upton appointed Phillip W. Broadhead and Fred Cooper to serve as guardians ad litem for Chrissy in the youth court proceeding that had been initiated on December 16, 1987, with Judge Dale's approval. In addition, it was further ordered that temporary physical custody of Chrissy be placed in a private home approved by the youth court and that Chrissy be physically and psychologically examined.

On December 18, 1987, Chrissy was taken to Judge Dale's chambers where Dale ordered physical and psychological evaluations of Chrissy. Neither referee Upton nor the guardians ad litem Broadhead and Cooper were notified or present during this proceeding. At Judge Dale's direction, Chrissy was taken out of town for examination, and, upon her return to Columbia later that afternoon, Judge Dale placed Chrissy in the home of her paternal grandmother Hathorn, with unlimited visitation by Foxworth. No record or transcript exists for any of the proceedings that were conducted by Judge Dale on December 18, 1987.

Based on these factual findings, the Court concludes that Chrissy's right of access to court proceedings was violated by Judge Dale's continuing chancery court action in the custody matter past that point on December 16 when a youth court petition was filed on Chrissy's behalf. Specifically, the Court notes that on December 16, Judge Dale informed the California court that a youth court petition had been filed in Marion County Youth Court on Chrissy's behalf. In doing so, Dale impliedly conceded all jurisdiction that the chancery court held over the abuse issue and impliedly consented to have that issue and any remedial action necessary to address that issue determined by the youth court. By continuing to act in light of the relinquishment of chancery jurisdiction and ordering examinations of Chrissy which served as a basis for a change in her legal and custodial status, Judge Dale interfered with Chrissy's right to have her interests adjudicated in a court of competent jurisdiction.

Alternatively, the Court finds that, even assuming Judge Dale did retain some form of jurisdiction which enabled him to issue the custody orders which were forthcoming on December 18, the proceedings which were utilized to issue such orders failed to provide Chrissy with adequate, meaningful access to a court proceeding.

Specifically, the Court notes that Chrissy's guardians ad litem were not informed of nor present at the hearing and that no record was made of this proceeding from which an adequate appeal could have been made. On this basis, the Court concludes that the December 18 hearing conducted by Judge Dale did not adequately afford Chrissy an opportunity to protect her legal interests. Accordingly, the Court finds that, as an alternative to the jurisdictional defect noted above, this theory also supports a finding that Judge Dale violated Chrissy's right of access to courts.

Finally, the Court considers whether affirmative conduct by Defendant Upton during the December 30, 1987, youth court hearing violated Chrissy's right of access to courts. As the Court has previously noted, no record of this proceeding was ever made. The Court also notes that the final judgment issued as a result of that proceeding reflects that several crucial reports, namely those reports of Drs. Bradford, McCrary, and Russell which supported the allegation that Chrissy had been sexually abused, were never admitted into evidence nor were they considered by Upton in his final judgment. Based on these findings, as well as the inferences raised by the facts surrounding the youth court hearing which strongly suggest that the proceeding was little more than a pretext to facilitate the enforcement of chancery court orders which had previously been entered by Judge Dale, the Court concludes that Upton violated Chrissy's right of access to courts by subjecting her to a proceeding which fell woefully short of those basic features which mark an adequate adjudicatory proceeding. At a minimum, a complete record of this proceeding should have been made to ensure that an adequate appeal of the youth court judgment could have been made. The lack of a record in the youth court proceeding indicates to this Court a lack of substance to that proceeding and leads to the inescapable conclusion that Chrissy's right of access has been violated. Additionally, the Court finds that Upton failed to ensure that Chrissy was afforded meaningful representation and should have been aware during the course

of the youth court proceeding that the guardians ad litem were not sufficiently discharging their duties to their client or the court. While this Court does not suggest that Upton should be held accountable for the deficiencies in representation caused by the guardians ad litem themselves, it does hold Upton liable for continuing to adjudicate Chrissy's legal rights in light of the obvious lack of representation that was being afforded to a small child who was otherwise unable to protect herself. Accordingly, the Court finds that Defendant Upton violated Chrissy's right of access to courts.

### C. Procedural Due Process Claims

Plaintiff next asserts that the Youth Court Law, Miss.Code Ann. § 43–21–101 *et seq.*, created legitimate and sufficiently vested property interests on behalf of Chrissy such that a deprivation of those interests without due process of law was constitutionally impermissible.

In analyzing procedural due process claims, the Court must consider whether a property interest inuring to the claimant's benefit does in fact exist. *Baptist Memorial Hospital–DeSoto, Inc. v. Mississippi Health Care Commission*, 617 F.Supp. 686, 689 (S.D.Miss.1985) (citing *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983)). "Property" denotes a broad range of interests that are grounded in or defined by a source of authority independent of the due process clause itself. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

> The hallmark of property ... is an individual entitlement grounded in state law, which cannot be removed except "for cause."

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982). In support of the contention that Chrissy has been deprived of certain vested interests she held under state law, Plaintiff notes particular provisions of the Youth Court Law which statutorily mandate the reporting and investigation of

child abuse and which provide a procedural framework for the adjudication of such claims. In connection with reporting and investigating instances of child abuse, the Youth Court Law mandates that designated professionals and law enforcement officials, having reasonable cause to suspect that a child is neglected or abused "shall cause an oral report to be made immediately ... and followed ... thereafter ... by a report in writing" to the Mississippi Department of Public Welfare. *See* Miss. Code Ann. § 43–21–353 (1972). Upon receiving such a report, the Department of Public Welfare "shall" immediately refer the report to the "intake unit" and/or youth court prosecutor. *Id.* After receiving the report, the intake unit "shall promptly make a preliminary inquiry to determine whether the interest of the child ... requires the youth court to take further action." *Id.* § 43–21–357. In addition, the intake unit "shall immediately forward the complaint to the [Department of Public Welfare] to promptly make an investigation or report ... and promptly present the findings thereof to the intake unit." *Id.* The intake unit must then recommend to the youth court whether further action should occur, and the youth court can then decide whether to follow those recommendations. *Id.*

Where it is determined that a youth court proceeding is necessary, the Youth Court Law states that the youth court "shall have exclusive original jurisdiction" in all proceedings involving an abused child, *see id.* § 43–21–151, and that, when "it is determined that [a person before another court] is a child under the jurisdiction of the youth court, such court shall ... immediately dismiss the proceeding" and forward all documents to the youth court. *Id.* § 43–21–159. Where allegations of abuse are at issue, a youth court proceeding shall be commenced in the court where the child's custodian resides or in the county where the child is present when the report is made to the intake unit. *Id.* § 43–21–155(2). Further, "[n]o court other than the youth court shall issue ... [a] custody order for a child in a matter in which the youth court has exclusive original jurisdic-

tion but shall refer the matter to youth court." *Id.* § 43–21–301(1).

With regard to those procedural due process claims which have been asserted on the basis of the foregoing statutes involving investigatory functions and the initiation of youth court proceedings, the Court finds that Plaintiff has failed to establish that Chrissy was deprived of any property interest inuring to her benefit under these particular statutory provisions. Based upon the evidence presented in this matter, the Court finds that those Defendants who were charged under state law with a duty to investigate allegations of abuse and to attempt to initiate youth court proceedings if such action was deemed necessary did in fact comply with the statutory mandate. In this regard, the Court notes that this case presents a factual scenario that the Youth Court Law did not contemplate. Clearly, the reporting and investigatory scheme mandated under the act contemplates that jurisdiction over allegations of abuse would rest with the youth court. As this Court has previously noted, however, the youth court did not have jurisdiction to act in this particular instance. Accordingly, much of the reporting and investigation that occurred in this matter was not and could not be used in the manner contemplated by the Youth Court Law. The Court finds that, under the circumstances confronting them, the welfare department personnel, Douglas, and any others responsible for reporting and investigating allegations of abuse of Chrissy substantially complied with their statutory duties. Indeed, the record reflects that many of the Defendants did their utmost to ensure that all relevant information was available to those individuals who had the authority to act in this matter. Accordingly, the Court finds that Plaintiff has failed to establish that Chrissy was deprived of any entitlements she held under these particular statutory provisions.

 Plaintiff has also asserted a procedural due process claim on the basis the Defendant Upton failed to comply with state law regarding the manner in which youth court proceedings are to be conduct-

ed. Specifically, Plaintiff notes that the Youth Court Law provides that the "youth court shall appoint a guardian ad litem" for a child in every case involving an abused child. Miss.Code Ann. § 43–21–121(1)(d), (e) (1972). Each party to a youth court proceeding "shall have the right to be represented by counsel at all stages of the proceeding." *Id.* § 43–21–201. Further, "[i]n all [youth court] hearings ... a complete record of all evidence shall be taken by stenographic reporting, by mechanical or electronic device or by some combination thereof," *see id.* § 43–21–203(7), and "all parties to a youth court cause shall have the right at any hearing in which ... [a] report is admitted in evidence ... to introduce evidence controverting the contents of the report." *Id.* § 43–21–203(9).

Upon an examination of the above cited statutes, the Court concludes that these provisions of the Youth Court Law create property interests which Chrissy may enforce under the due process clause. Where a state statute mandates that officials take certain affirmative actions to ensure the well-being and promote the welfare of a child, that child can state a due process claim based upon deprivation of a property interest where officials have failed to follow the statutory mandate. *See Meador v. Cabinet for Human Resources,* 902 F.2d 474, 476–77 (6th Cir.1990); *Taylor v. Ledbetter,* 818 F.2d 791, 799–800 (11th Cir. 1987). Accordingly, the Court finds that, to the extent that Defendant Upton failed to have a record made of the youth court proceeding, Chrissy was deprived of a property interest to which she was entitled under the fourteenth amendment. Additionally, the Court finds that, while Upton did appoint a guardian ad litem for Chrissy, he failed to ensure that her interests were adequately protected by that representation and effectively denied her right to present evidence on her behalf as established under Mississippi law. Accordingly, the Court concludes that Upton deprived Chrissy of a protected property interest on this basis as well.

### D. CAPTA Claims

Plaintiff next asserts claims against various Defendants for alleged violations of certain provisions of the Child Abuse Prevention and Treatment Act ("CAPTA"), 42 U.S.C. § 5101 *et seq.* Plaintiff contends that CAPTA issues are properly before this Court on three bases. Initially, Plaintiff contends that CAPTA itself creates substantive rights and a private right of action that may be enforced under section 1983. Secondly, Plaintiff contends that CAPTA is applicable to this action because of its incorporation into Part B of Title IV of the Social Security Act, 42 U.S.C. § 620 *et seq.,* which has traditionally been enforced through private rights of action. Finally, Plaintiff asserts that, in addition to rights created either directly under CAPTA or through its incorporation into Title IV, federal regulations promulgated pursuant to CAPTA independently give rise to substantive rights which may be enforced in this action.

■■■ A private litigant may state a cause of action under section 1983 for the deprivation of rights secured by a federal statute. *Wright v. City of Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987); *Maine v. Thiboutot,* 448 U.S. 1, 3–6, 100 S.Ct. 2502, 2503–05, 65 L.Ed.2d 555 (1980). In order for an action to be properly maintained under such circumstances, however, it must be established that the federal statute in question does in fact create a "right, privilege or immunity" within the meaning of section 1983. *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 19, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981); *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981).

■■■ CAPTA expressly authorizes the Secretary of Health and Human Services to provide grants to the states "for purposes of assisting the states in developing, strengthening, and carrying out child abuse and neglect prevention and treatment programs." 42 U.S.C. § 5106a(a). In order to qualify for such assistance, states must comply with certain statutory requirements aimed at assuring that proper

reporting, investigative, personnel, health care, and legal programs and procedures exist to protect and promote the interests of abused and neglected children. *See* 42 U.S.C. § 5106a(b).[13]

An examination of relevant legal authority reveals that other jurisdictions which have considered the issue raised by Plaintiff have split on the issue of whether substantive rights are created under CAPTA or Title IV of the Social Security Act, and, if so, the extent of the rights so created. *Compare L.J. v. Massinga,* 838 F.2d 118, 123 (4th Cir.1988) (Title IV creates an enforceable right to a properly implemented and operated case review system for foster children); *Lynch v. Dukakis,* 719 F.2d 504, 509–12 (1st Cir.1983) (children under jurisdiction of foster care program had substantive right in case review system); *Artist M. v. Johnson,* 726 F.Supp. 690, 694 (N.D.Ill.1989) (substantive right to case review system created under Title IV); *Joseph A. v. New Mexico Department of Human Services,* 575 F.Supp. 346, 353 (D.N.M.1982) (private litigants may obtain declaratory and injunctive relief for violations of Title IV); *with Scrivner v. Andrews,* 816 F.2d 261, 263 (6th Cir.1987) (Title IV creates no right to meaningful visitation); *B.H. v. Johnson,* 715 F.Supp. 1387, 1401 (N.D.Ill.1989) (Title IV creates no enforceable federal rights); *Jensen v. Conrad,* 570 F.Supp. 91, 113 (D.S.C.1983) (neither Title IV nor CAPTA create any substantive rights that can be enforced by private litigants).

Based upon the record presented in this case, however, the Court concludes that it is not necessary to determine at this point whether Chrissy in fact has substantive rights by virtue of CAPTA, CAPTA in-

spired federal regulations, or Title IV of the Social Security Act. Plaintiff has failed to present any evidence which would suggest that the State of Mississippi has failed to comply with the funding conditions set out in section 5106a(b). At most, Plaintiff has challenged discretionary acts that were undertaken by various state officials and state employees with regard to particular decisions that were made in the course of handling Chrissy's case. While Plaintiff may in fact find these decisions objectionable, they simply *offer no support* to the contention that the programs and procedures mandated by section 5106a(b) have not been established. Accordingly, the Court finds that, even if it were to assume that substantive rights were created under CAPTA or Title IV which could be enforced here, Plaintiff has failed to produce any evidence which suggests that she would be entitled to prevail on such a claim.

### E. Pendent State Law Claims

Plaintiff has also asserted certain pendent state law claims in this matter for assault and battery and negligence. At Plaintiff's request, *see* Plaintiff's Proposed Findings of Fact and Conclusions of Law at 3, the Court exercises its discretion and dismisses those claims without prejudice.

### III. REMEDIES

The prayer for relief in this matter requested declaratory, injunctive, and monetary relief. Because monetary damages were not sought against Defendants Dale and Upton, the only Defendants in this matter which have been found to have vio-

---

**13.** As particularly relevant to the instant matter, 42 U.S.C. § 5106a(b) provides:

In order for a State to qualify for a grant under subsection (a) of this section, such State shall—

(1) have in effect a State law relating a child abuse and neglect, including—

(A) provisions for the reporting of known and suspected instances of child abuse and neglect;

\* \* \* \* \* \*

(2) provide that upon receipt of a report of known or suspected instances of child abuse

or neglect an investigation shall be initiated promptly to substantiate the accuracy of the report, and upon a finding of abuse or neglect, immediate steps shall be taken to protect the health and welfare of the abused or neglected child[;]

\* \* \* \* \* \*

(6) provide that in every case involving an abused or neglected child which results in a judicial proceeding a guardian ad litem shall be appointed to represent the child in such proceedings;

\* \* \* \* \* \*

lated Chrissy's constitutional rights, no such award will be made.

Based on the foregoing findings of fact and conclusions of law, the Court concludes that declaratory relief should issue on the basis that both Defendants Dale and Upton have violated Chrissy's right of access to courts. Declaratory relief should also issue on the basis that Defendant Upton has violated Chrissy's procedural due process rights.

As to the matter of injunctive relief, Plaintiff has requested a wide range of relief which she contends is necessary to ensure that Chrissy is afforded her constitutionally protected rights. Many of the measures Plaintiff requests go beyond that amount of relief which the Court feels would be necessary to remedy past wrongdoing and ensure that Chrissy's interests are adequately protected. Accordingly, the Court finds that adequate relief can be afforded in this matter by enjoining Defendant Upton, in his capacity as youth court referee of Marion County, Mississippi to conduct a new hearing on Chrissy's behalf and re-examine the issue of whether she has been sexually abused and, if so, what action should be taken. Plaintiff has requested that this Court include in the order for injunctive relief specific directives regarding the manner in which the youth court hearing should be conducted. The Court, however, does not feel that this would appropriate at this time. Interference with the manner in which a state court conducts its proceedings and in which it exercises its discretionary authority on many matters which routinely arise during the course of any judicial proceeding is an extreme step and one which this Court would take only under the most compelling of circumstances. Accordingly, the Court will simply order a new youth court proceeding in this matter. The Court does expect, and this order implicitly requires, that the youth court proceeding will conform to all statutory requirements and constitutional protections to which Chrissy is entitled. If, at any point in carrying out the relief ordered by this Court, the youth court proceeding fails to conform to statutory and constitutional standards, Plaintiff remains free to petition the Court at that point for clarification or for additional injunctive orders.

## IV. CONCLUSION

The Court can ascribe no improper motive to any of the parties to this lawsuit. Each of the parties, at all times, appears to have had the best interests of Chrissy in mind. The nature of this proceeding has necessarily dichotomized the parties to this controversy depending upon their own contentious evaluation of the ultimate fact at issue here, whether Chrissy was in fact sexually abused. The Court fears, however, that this issue will never be conclusively resolved. Some of the parties will always believe that Chrissy was abused, and others will always be convinced that she was not. Regardless, this nine year old girl has been and will continue to be the focus of court proceedings and the media spotlight for some time to come. Perhaps the end result will be a clarification of law which will make future litigation of the same issue for other children fairer and less disruptive than it has been for Chrissy.

IT IS THEREFORE ORDERED that a declaratory judgment be entered in favor of Plaintiff, declaring that Defendants Dale and Upton have deprived Chrissy Foxworth of her constitutionally protected right of access to courts.

IT IS FURTHER ORDERED that a declaratory judgment be entered in favor of Plaintiff, declaring that Defendant Upton has deprived Chrissy Foxworth of her procedural due process rights as guaranteed by the fourteenth amendment to the United States Constitution.

IT IS FURTHER ORDERED that Defendant Upton, in his capacity as youth court referee of Marion County, Mississippi, is hereby enjoined to conduct a new youth court proceeding for the benefit of Chrissy Foxworth regarding the allegations of sexual abuse.

IT IS FURTHER ORDERED that, pursuant to this Memorandum Opinion and Order, a separate Declaratory Judgment

and Order for Injunctive Relief be entered in this cause.

SO ORDERED.